[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The Plaintiff, Animal Rights Front, Inc., an environmental intervenor, appeals from a March 20, 2001 final decision of the defendant Plan And Zoning Commission of the Town of Glastonbury ("the commission"). This decision gave subdivision and special permit approval to an application by defendant Rejean Jacques d/b/a Rejean Realty, Inc. ("Rejean") to develop real property owned by the defendant Zella D. Ferrando ("Ferrando") in Glastonbury, Connecticut. The appeal is taken pursuant to General Statutes § 8-8 (b)
By way of background, in August 1996 Rejean first presented a preliminary plan for the subdivision to the Glastonbury community development staff. A formal application for the special permit and subdivision approval[1] was filed on or about March 27, 1998[2], and it was approved by the commission on April 21, 1998. Return of Record ("ROR"), Number 11. Over the several months between Rejean's first contact with the community development staff and the formal filing, the community development staff (including John Rook, the town planner) had analyzed proposed applications from Rejean, public hearings had been held before commission, and on March 26, 1998, Conservation Commission approval had been obtained.
Occupying the time of the community development staff and the commission was the basic issue of the plaintiff's appeal-preservation of the Eastern Timber Rattlesnake, an endangered species common to the Diamond Lake section of Glastonbury. On December 5, 1996, soon after the original Rejean proposal was submitted, the town planner, John Rook, who had written a masters thesis on rattlesnakes, gave his comments on the proposal to a subcommittee of the commission. He expressed his concern that the subdivision as proposed had lots that fronted on Goodale Road, pointing out that it was a dirt road "within the home range of the State endangered Timber Rattlesnake and it is very likely that they pass CT Page 14777 through this property based on incident reports in the area." Rook urged the commission to consider requiring less traffic on Goodale Road. An immediate reaction from Rejean was to oppose any reduction in the lots. ROR, Number 12.
At the May 6, 1997, commission meeting, Rejean proposed a fifty-foot buffer along Goodale and Diamond Lake Roads to accommodate migration of the rattlesnakes. Rook stated that fifty feet was not a "magic number," and it would have to be developed what was necessary to provide an escape corridor for the rattlesnakes. Subsequently on June 5, 1997, at a subcommittee meeting of the commission, with Rook present, a representative of Rejean announced that the proposal was being altered to an open space subdivision with 30,000 square feet minimum lots. Additional land was being added as a conservation easement. ROR, Number 12.
Also during this time period, Douglas Fraser, a biology professor at Siena College, made his views known to both the commission and the Conservation Commission. On March 13, 1997, Fraser gave a slide presentation and led a subsequent discussion on the habitat and ecology of the Eastern Timber Rattlesnake at a joint meeting of the commission and the Conservation Commission. Also present for the presentation were Tom Mocko, the town's environmental planner, and John Rook. A representative from the Department of Environmental Protection, Julie Victoria, attended and had previously written a letter stating her position on Rejean's project. She stated her preference that construction should take place during the snake's dormant period, October through February, and that the construction workers should be warned that the snake was an endangered species. ROR, Number 12.
After the formal application was filed by Rejean in March 1998, on April 16, 1998, Rook prepared a memorandum to the commission for their review prior to the commission meeting of April 21, 1998. ROR, Number 12. He began by calling the commission's attention to the "[s]ignificant revisions" that Rejean had made to the earlier layouts. The project was no longer a "conventional subdivision proposal." Now under consideration was an "open space subdivision layout" with a "large 43 acre conservation easement encompassing "other land' of the owner [that] abuts the potentially subdivided land to the west. This is very important natural land, containing wetlands and watercourses, steep slopes, ledge outcrops and very beneficial wildlife habitat."
Rook then set forth other significant changes to the original Rejean proposals including a "200 foot wide section along Goodale/Diamond Lake Road" and "elimination of all frontage lots on Goodale/Diamond Lake CT Page 14778 Road, including the two that were proposed in the large westerly conservation easement area (which is also an important wildlife corridor.) "
On the topic of the rattlesnakes, he continued:
 As you know, this site falls within the range of the State Endangered Timber rattlesnake. Sighting documentations and tracking studies indicate these animals are definitely found in the area, and at the very least, periodically travel through the project site. It is possible that the snakes avoid portions of the property that have been previously disturbed and provide less than desirable cover. The many documented sightings on Goodale/Diamond Lake roads indicate the snakes travel along and cross the road. Minimizing traffic along the road (no through connections with the project site) and providing the 200 foot wide open space corridor, which provides cover, will help reduce mortality. It also appears the snakes utilize the large westerly parcel, proposed as conservation easement.
Rook noted the receipt of the position of Julie Victoria of DEP, who had recommended that the project work be "done during the snakes dormant period." He had discussed this suggestion with Professor Fraser, "who conducts research of the Timber rattlesnake, [and] he has indicated that it would be very difficult to identify the best time to concentrate development during the snake's active season. Educating contractors relative to the snake's protected status will be very important." Rook concluded by referring to a letter from another person involved in snake research, Robert Fritsch. His specific objections to the project had been addressed by the elimination of lots on Goodale Road.
The commission took up the Rejean application on April 21, 1998. A presentation by Rejean and public comment preceded the vote by the commission. No one spoke in opposition to the application. Supplemental ROR, exhibit II. The commission approved the application, with the modifications recommended by Rook and accepted by Rejean, unanimously. ROR, Number 11. Immediately thereafter, the plaintiff, as well as the Animal Welfare and Rights Entity, Inc., and one Melody Hyllen-Davey filed an appeal of the commission's decision, pursuant to General Statutes § 22a-19 of the Environmental Protection Act. The Superior Court dismissed the appeal because the appellants had not intervened in the proceedings before the commission and the Appellate court affirmed. CT Page 14779Hyllen-Davey v. Town Plan Zoning Commission, 57 Conn. App. 589, cert. denied, 253 Conn. 926 (2000).
Subsequently it developed that Rejean had failed to file the subdivision plans in the town clerk's office within ninety days of the termination of the appeal as required by § 8-25. The town attorney informed Rejean that he believed that the original subdivision approval had become void. ROR, Number 10. Rejean thereupon determined to re-file its application.
A few months before the new application was filed, the commission and the Conservation Commission held a joint meeting to hear from Professor Fraser and Michael Clemons of the Wildlife Conservation Society. Fraser gave another slide presentation on the Eastern Timber Rattlesnake. The snake frequents the Diamond Lake region; its females have a slow reproduction rate; the snakes have dens in the region, but in the summer months forage away from the dens; and the male snakes may be found on the subdivision roads. He concluded that as more dense subdivisions are built, rattlesnakes will be found more frequently and will be exposed to the danger of being killed. Clemons noted the dangers to the rattlesnakes, but emphasized the means to safeguard them was to allow Rook, as town planner, to make suggestions to mitigate the problem. Supplemental ROR, Exhibit 3.
Rejean filed its application for a second time on October 10, 2000, noting that it was unchanged from the first application. ROR, Number 1. The plaintiff filed an intervention petition pursuant to § 22a-19 on November 1, 2000).[3] The hearing on this application was held on February 6, 2001. ROR, Numbers 15 and 21.
Prior to this hearing the commission received a memorandum from Rook. He stated that the application was unchanged from the application approved on April 21, 1998. He also indicated that the modifications made by the commission to the prior application had been included in this application. The Conservation Commission approval was still applicable. The preservation of natural resources, including the timber rattlesnake, was still the major issue before the commission. ROR, Number 10. The DEP also sent a new letter, almost identical to their earlier one, making suggestions on how to protect rattlesnakes during the subdivision construction process. ROR, Number 13.
At the hearing much attention was paid to rattlesnakes "sunning themselves" on asphalt driveways in the Diamond Lake area. At this hearing there was some neighborhood opposition. In addition the plaintiff's attorney read a letter from Fritsch who stated that any change CT Page 14780 in traffic pattern would endanger the rattlesnake population now and in the future. ROR, Number 19, p. 3.
Professor Jeff Hammerson of Wesleyan University told the commission that for the past three years he had studied the habitat of the timber rattlesnake in the Portland area. He concluded that pregnant female rattlesnakes bask more than "your average rattlesnake." The snakes were attracted to semi-open areas, such as lawns and driveways, and would be attracted to the proposed development in a "detrimental fashion." ROR, Number 21, pp. 14-15.
Professor Fraser also made a lengthy presentation. He used the Imperial Drive subdivision, recently constructed in the area, as a benchmark to predict the mortality rate of the rattlesnake. He calculated that the reported number of rattlesnake deaths during the year was three and that the Rejean subdivision would likely cause the death of an additional rattlesnake. The only means to avoid this outcome was to decrease the size of the proposed subdivision by fourteen lots. ROR, Number 12, p. 14. While he felt that Rejean had made progress with its addition of the conservation easement, it had not addressed the mortality of the snakes sufficiently.
Rejean's attorney replied to Professor's Fraser's presentation. The application had not changed from that approved in 1998, and the only difference between Fraser's statement then and now was his assessment of the mortality rate. The protection of rattlesnakes on Goodale Road had been addressed by restricting access to the road and keeping the road in its rural character. Rejean had set aside over one-half of the property to protect the rattlesnake. It was unlikely that the subdivision would affect the primary den of the snakes. ROR, Number 21, pp. 17-32. At this point Professor Fraser admitted that in his study it was not clear if all the snakes that had been sighted were rattlesnakes. ROR, Number 21, pp. 36-37.
The director of the community development office, Kenneth Leslie, who was Rook's supervisor, concluded the hearing by stating that they had been educated and had listened to experts. "This isn't the first subdivision where we have had to address the Timber Rattlesnake and I think clearly, in looking at reasonable and prudent alternatives, you can see that we went through several design evolutions and iterations. . . . We have established in the . . . area was based on fact by experts, professor Fraser and others. Mr. Rooks knowledge of the habitat area and we tried to take what we learned in that and improve it in the subdivision, and I believe we have." ROR, Number 21, p. 42. CT Page 14781
On March 20, 2001, the commission met to discuss the pending Rejean application. The commissioners concluded that the application did not change in any material aspect from the application approved in April 1998. The chairwoman noted that the commission had relied upon Rook's expertise in devising the conditions accepted by Rejean. ROR, Number 22, p. 9. Another member pointed out that the commission had to make a rational land use decision, that they could not restrict development completely so that there would be no danger to the rattlesnake. ROR, Number 22, pp. 18-19.
On a motion by vice-chairman Lepore, the application was approved unanimously, with the following relevant findings:
 1. The proposal, with conditions, adheres to the Glastonbury Building Zone Regulations and Subdivision and Resubdivision Regulations, particularly in terms of an open space subdivision.
 2. The applicant has successfully modified the subdivision plans to protect natural resources and protected species habitat in accordance with Sections 14.0 and 14.2 of the Glastonbury Subdivision and Resubdivision Regulations, furthermore the subdivision plan evolved with several design and layout changes that were driven by the goal of providing a lessened impact on the Timber Rattlesnake and to provide a subdivision layout that responds to the protection of endangered species. Evidence was not presented that would indicate that the project would have an unreasonable impact to the environment or cause unreasonable harm to a protected species.
 3. This proposal incorporates important open space preservation techniques by protecting more than 50% of the 97 acre subject property as Town Open Space and private conservation easement. This includes a 200 foot wide open space corridor along Goodale Hill Road/Diamond Lake Road that provides cover to Timber Rattlesnakes that may be traveling along or crossing the road.
4. This proposal does not incorporate a roadway connection or driveway accesses to Goodale Hill/Diamond Lake Road, thus discouraging vehicular access to this road from the project site. . . . CT Page 14782
* * * *
 7. Based upon the testimony provided, there was no evidence that there has been a substantial change in the circumstances involving this application in relationship to the previously approved application and, therefore, the Commission is bound by law to reapprove this project.
 8. The Commission has carefully considered the allegations of the intervening petitioner as required by Connecticut General Statutes-Section 22a-19 and specifically finds that the proposed development will not lead to the unreasonable impairment or destruction of the public trust in a natural resources of the State — specifically the Eastern Timber Rattlesnake.
ROR, Number 20, p. 13. This appeal followed the commission's approval.
Turning to the issue of aggrievement in the context of an appeal by an intervenor under § 22a-19, Supreme Court precedent requires the plaintiff herein to demonstrate that it raises environmental concerns that were within the jurisdiction of the zoning commission and that its petition contains specific allegations setting forth those claims. Nizzardo v. State Traffic Commission, 259 Conn. 131 (2002); See also Keiser v. Zoning Commission, 72 Conn. App. 721 (2002). The plaintiff has satisfied these requirements here. The commission's subdivision regulations (ROR, Number 23) §§ 14.0, 14.2 require the applicant to submit written information about any protected species and to demonstrate that its proposal will not harm the protected species, including the timber rattlesnake[4]. The plaintiff specifically alleged in its intervention petition that the proposed use of the subject property involves conduct impairing natural resources including destruction of the timber rattlesnake.
The defendants further question the plaintiff's standing by pointing out that § 22a-19 exists for the protection of "natural resources." They contend that the timber rattlesnake does not fall under the category of "natural resources." This issue was resolved in the companion case of Animal Rights Front, Inc. v. Plan and Zoning Commission, CV 98 0579968 in a decision by Judge Wagner. Denying a motion to strike on March 5, 1999, Judge Wagner stated that under Paige v. Town Plan Zoning Commission, 235 Conn. 448, 454 (1995) that it was "evident" that CT Page 14783 endangered species, such as the timber rattlesnake, are natural resources. Judge Wagner also rejected the same argument made in this appeal that since the legislature had enacted an endangered species act, Chapter 495, General Statutes, the plaintiff was precluded pursuing intervention on behalf of the rattlesnake under § 22a-19.[5] The court concurs in the conclusions, of Judge Wagner and finds aggrievement.
Turning to the merits of the appeal, the plaintiff first claims that commission erred in its approval because it failed to require Rejean to submit the application to the Conservation Commission for its approval prior to its own favorable action. The subdivision regulation in question, § 5.9(d), actually requires that the applicant provide the commission with a "statement" from the Conservation Commission on the proposal.
Here at the time of the commission's approval, the Conservation Commission had issued a five-year inland wetlands permit on April 27, 1998, to Rejean setting forth conditions relative to the timber rattlesnake. Supplemental ROR, Number 21, Exhibit II. The commission also had before it the recommendation of the Conservation Commission issued to the commission in 1998 at the time the wetlands permit was issued. ROR, Number 18. Finally on February 1, 2001, the commission was sent a memorandum by the Community Development staff enclosing the recommendation of the Conservation Commission, stating that the application remained unchanged and that the project had been subject to significant prior review by the Conservation Commission. ROR, Number 10.
The presence of this material in the record at the time of the vote by the commission satisfies any duty imposed by regulation § 5.9(d) on the commission to have a statement by the Conservation Commission before the commission's second approval. See also County Wide Home Improvement and Maintenance Co., Inc. v. Planning and Zoning Commission, Superior Court, judicial district of Hartford/New Britain at New Britain, Docket No. CV91 447452 (March 18, 1993, Berger, J.) (applicant must seek another review by conservation commission where conservation commission had not taken up the permit issue previously on the same "specific proposal.")
The plaintiff also claims that the commission was not bound by its prior approval of the Rejean application. The Appellate Court has stated that a planning and zoning commission may not reverse a prior subdivision approval unless "(1) a change of condition has occurred since its prior decision or (2) other considerations materially affecting the merits of the subject matter have intervened and no vested rights have arisen." (Citations Omitted). Carlson v. Fisher, 18 Conn. App. 488, 497 (1989). CT Page 14784
Subsequent cases have indicated that the phrase "change of conditions" refers to material changes in the condition of the property subject to subdivision. See, e.g, Grace Community Church v. Planning and Zoning Commission, 42 Conn. Sup. 256, 271 (1992) (Judge Fuller states that there was no evidence of "changed conditions in the immediate vicinity of the subject property. . . ."); Levada v. Cheshire Planning Zoning Commission, Superior Court, judicial district of New Haven, Docket No. CV 92 0326829S (November 6, 1992, Riddle, J.) ("no change of conditions on the lot"); Parent v. Zoning Board of Appeals, Superior Court, judicial district of Hartford/New Britain, Docket No. CV 97 0574848 (March 9, 1999, Maloney, J.) (shape and size of the lot and the position of the house on it had not changed).
Here there was no change between the Rejean application of 1998 and the second application as regards the intended subdivision plan. Indeed, as indicated above, the commission made a specific finding (ROR, Number 18, finding 7) that there had not be a substantial change in circumstances from the prior approval. The Appellate Court has stated that "[t]he determination as to whether the application under review is substantially the same as the prior application and that circumstances and conditions have not changed so as to affect materially the merits of the application is for the [commission] to determine in the first instance." Bradley v. Inland Wetlands Commission, 28 Conn. App. 48, 51 (1992).
The second reason given in Carlson for releasing the commission from a binding prior approval is that "other considerations materially affecting the merits of the subject matter have intervened. . . ." See also Charter Development Corp. v. Clinton Planning Zoning Commission, Superior Court, judicial district of Middesex, Docket No. CV 99 0090367S (November 30, 2000, Miano, J) (review comments of commission members and record to determine whether other considerations exist). Here Professor Fraser testified on at least three separate occasions about the effect of the Rejean project on the rattlesnake population; in 1997 his presentation became a part of the record in the initial approval, in 2000 his presentation to the commission and the Conservation Commission became part of the renewed application process, as did his presentation at the February 6, 2001 hearing. Contrary' to the plaintiff's contention, Professor Fraser had the same point to make in each presentation — the Eastern Timber Rattlesnake was an endangered species and that proceeding with the subdivision plan would place the rattlesnake at a greater risk than if it were not implemented. He also indicated, as did Professor Hammerson, that the basic data showing the danger of impairment did not change over the entire time period of the two applications. ROR, Number 21, pp. 13-14. This testimony does not support the plaintiff's CT Page 14785 argument that there had been a material change of conditions between the two applications. The court therefore concurs in the commission's conclusion that it was bound by the prior approval of the Rejean application.
The plaintiff argues that Professor Fraser presented a new formula at the February 6, 2001 hearing and based on his calculations, made a recommendation to reduce the number of lots in the subdivision. It also argues that it had not intervened in the prior application process while it had filed a petition for intervention in this commission proceeding. Even if the court were to focus on these developments and conclude that the commission was not bound by the prior approval, the court would still find no error in the commission's March 20, 2001, final decision.
The plaintiff claims, and it is not disputed by the defendants, that the commission did not specifically consider "feasible and prudent alternatives" to the development of the subdivision as regards rattlesnake protection. Section 22a-19 has two subsections. Subsection (a) permits intervention in the commission proceedings by an entity such as the plaintiff to demonstrate that a proposed activity "involves conduct which has, or which is reasonably likely to have, the effect of unreasonably . . . impairing or destroying the public trust in . . . natural resources of the state." Subdivision (b) requires the commission to consider this impairment or destruction and not authorize such conduct "so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of public health, safety and welfare."
The commission did not have to reach issues involving alternatives, however, if it concluded that the activity was not reasonably likely to cause unreasonable impairment or destruction of the natural resource. As the Supreme Court stated in Paige v. Town Plan Zoning Commission,235 Conn. 448, 462-63 (1995): "By its plain terms, General Statutes § 22a-19 (b) requires the consideration of alternative plans only where the commission first determines that it is reasonably likely that the project would cause unreasonable pollution or destruction of the public trust in the natural resource at issue." (Emphasis in original; internal quotation marks omitted.) See also Quarry Knoll II Corp. v. Planning Zoning Commission, 256 Conn. 674, 736 n. 33 (2001). Thus if a proper finding of no unreasonable impairment was made by the commission, then the commission was correct in not taking on a further discussion of alternatives imposed by subsection (b).
The plaintiff states that the only consideration when the commission considers "unreasonable impairment" is whether there is a slight or CT Page 14786 minimal harm to the natural resource itself. (Plaintiff's brief at 11). On such a showing, according to the plaintiff, the commission must proceed to consider the alternatives under subsection (b). Appellate cases do not support such a position. Rather a determination of what is an unreasonable impairment is a question of fact for the commission. "The question of what is reasonable is one of fact. . . ." (Citation omitted.) Mystic Marinelife Aquarium, Inc. v. Gill, 175 Conn. 483, 503 (1978). Under the similar Michigan Environmental Protection Act, what is an impairment "depends on the characteristics of the resources involved, the nature of the defendants' action, and the type of property involved." Kimberly Hills Neighborhood Ass'n v. Dion, 320 N.W.2d 668, 673
(Mich.App. 1982).
Absent a showing of aritrary, illegal or malicious action, the decision of the commission should be undisturbed by this court. "The conclusion of the trial court that the commission acted properly must be sustained unless the commission's decision is arbitrary, illegal or not reasonably supported by the evidence." (Internal quotation marks omitted.) Red Hill Coalition v. Conservation Commission, 212 Conn. 710, 718 (1989). "The trial court may not substitute its judgment for the wide and liberal discretion in these authorities when determining the public need and the manner of meeting it, because they are closest to the circumstances and conditions which create the problem and shape the solution. . . . Thus, the court may grant relief on appeal only where the local authority has acted illegally or arbitrarily or has abused its discretion." (Citations omitted; internal quotation marks omitted.) Frito-Lay, Inc. v. Planning and Zoning Commission, 206 Conn. 554, 572-73 (1988). Paige v. Town Plan and Zoning Commission sought to allay a fear that a zoning commission would have to consider alternatives under § 22a-19 "for every subdivision in the state." This would not happen, declared the Paige court, because the commission would first address the issue of reasonableness and would be able to consider the "factors and standards that govern the determination in each case." Id. at 462-63, quoting from Judge Schaller's dissent in the Appellate Court.
The plaintiff relies on Waterbury v. Washington, Superior Court, judicial district of Waterbury, Docket No. X01UWY CV 97140886 (February 16, 2000, Hodgson, J.), a case interpreting the similar §§ 22a-16,22a-17, to support its contention that on a minimal showing by an intervenor, § 22a-19 (a) is satisfied and the commission must advance to subsection (b). But the trial court's approach was rejected in an appeal to the Supreme Court. Sections 22a-16, 22a-17 allow a court suit to enjoin environmental violations; if the plaintiff proves unreasonableness, then the agency might raise the defense of having considered alternatives. CT Page 14787
 For us to conclude, as the trial court did in this case, that unreasonable means only some level more than de minimis, the only evidence of a defendant would be able to offer to rebut a prima facie case would be evidence that there was no pollution, impairment, or destruction of the natural resource.[6]
Thus, in many circumstances . . . the defendant's only defense would be the separate affirmative defense [of feasible and prudent alternatives]
 An examination of the legislative history of CEPA, however, reveals that § 22a-17 was not meant to relegate a defendant to disproving a CEPA violation solely by resorting to this affirmative defense. . . . [Representative Papandrea states that "unreasonableness is a matter of fact."] This suggests that the legislature intended that a court would be called upon to consider much more than whether . . . the conduct complained of was merely more than de minimis.
Waterbury v. Washington, 260 Conn. 506, 551-52 (2002).
The plaintiff also quotes from Gardiner v. Conservation Commission,222 Conn. 98, 109 (1992), finding a trial court's analysis flawed for not considering alternatives, even when no unreasonable impairment is found. The holding in Gardiner requiring consideration of alternatives has been weakened however, by the Paige decision. See Evans v. Plan and Zoning Commission, Superior Court, judicial district of Hartford, Docket No. CV 00-0800767-S, (June 11, 2001, Schuman, J.), affirmed, 73 Conn. App. 647
(2002). It has been noted, further, that Gardiner arose solely in an appeal from the decision of a wetlands agency, where the wetlands statutes controlled the result. 9A R. Fuller, Connecticut Practice Series, § 32.6.
The court therefore adopts a broader view of the meaning of "unreasonableness" as used in § 22a-19 (a) than the plaintiff seeks. The commission found in finding of fact 8, ROR, Number 18, p. 4, that proposed development would not lead to an unreasonable impairment or destruction of the Eastern Timber Rattlesnake. This finding requires the court to review the record for "substantial evidence."
The substantial evidence rule provides that "the reviewing court must sustain the agency's determination if an examination of the record CT Page 14788 discloses evidence that supports any one of the reasons given. . . . The evidence, however, to support any such reason must be substantial; [t]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . ., and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . The reviewing court must take into account [that there is] contradictory evidence in the record . . . but the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . ." (Internal quotation marks omitted.) Samperi v. Inland Wetlands Agency, 226 Conn. 579, 587-88 (1993).
In determining whether there is substantial evidence to support a finding of the commission, "a court must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness . . . in whole or in part. . . . Basically, an agency is not required to use in any particular fashion any of the materials presented to it so long as the conduct of the hearing is fundamentally fair." Funderburk v. Commissioner of Motor Vehicles, 68 Conn. App. 655. The agency might choose to rely on an expert for the plaintiff in whole or in part or not at all. Tompkins v. Commissioner of Motor Vehicles, 60 Conn. App. 830, 834 (2000). It may also chose to rely on the expertise of its members as well as reliable non-experts. Bradley v. Inland Wetlands Agency, supra, 28 Conn. App. 54.
In Julian v. Inland Wetlands/Watercourses Commission, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV 00 0599308 S (July 17, 2001, Maloney, J.), the plaintiff appealed from the decision of the Bloomfield inland wetland commission. In considering the question of reasonableness under § 22a-19, the court addressed the substantial evidence issue in the context of a commission weighing the testimony of expert witnesses who held opposing opinions on the issue of unreasonable impairment. The court relied on Samperi in upholding the decision of the agency. The court in Julian concluded that "[t]he fact that the experts disagreed on the environmental impacts of the project, therefore, does not invalidate the commission's ultimate finding that the [developer's] activities would not unreasonably pollute or impair the natural resources of the state." CT Page 14789
The court has set forth above the materials before the commission which showed that Rejean had, at the insistence of the Community Development staff, made numerous changes in the original subdivision proposal to protect the rattlesnakes. These included the conservation easement, the 200-foot buffer, the elimination of frontage lots on Goodale Hill/Diamond Lake Road, and the realignment of the roadway system to discourage travel on Goodale Hill Road. The commission relied upon these changes, the explanations of John Rook, and its own knowledge to conclude that there was no unreasonable impairment of the Eastern Timber Rattlesnake. The court concludes that there is substantial evidence to support the required finding of the commission.[7] The commission was not required to consider the various alternatives to the proposed development under § 22a-19 (b)
The appeal is therefore dismissed.
BY THE COURT
 ___________________ Henry S. Cohn, J.